Submitted September 30, 2011, affirmed January 5, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TYLER NATHAN KINKADE,
aka Tyler Nathen Kinkade,
*Defendant-Appellant.*

Multnomah County Circuit Court
090330897; A144173

270 P3d 371

Peter Gartlan, Chief Defender, and Ingrid A. MacFarlane, Deputy Public Defender, filed the briefs for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Defendant was convicted of drug-related offenses based on evidence that officers discovered after defendant consented to a weapons patdown. On appeal, defendant argues that his consent was the product of an illegal seizure, because police requested permission to pat him down without reasonable suspicion that he had committed or was about to commit a crime. He further argues that, even if he was not illegally seized *before* he consented, he was illegally seized *during* the patdown. We conclude that, under *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010), defendant was not seized when he consented, and he never renounced or withdrew his consent. We therefore affirm.

We state the facts consistently with the trial court's findings of historical fact, which are supported by evidence in the record. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). In the early evening of March 8, 2009, Officer Roberts was patrolling a Portland area where he knew that there were "a lot of drugs," and he received information that defendant had sold methamphetamine to an informant. Roberts was familiar with defendant but had never personally met him. He kept defendant under surveillance for more than an hour, but did not see anything that would allow him to execute a stop based on reasonable suspicion of criminal activity. Around 6:00 p.m., Roberts decided to initiate an encounter with defendant.

He caught up to defendant in a crosswalk and addressed him by name. He asked defendant whether they could talk, and defendant said, "Sure." They proceeded to the sidewalk, where Roberts asked defendant for permission to pat him down. The officer's demeanor was casual. Defendant replied, "Sure, go ahead," and Roberts began the patdown. He asked defendant to interlace his hands behind his head, and defendant complied. Roberts then put one of his own hands on top of defendant's hands and used his other hand to conduct the patdown. While patting down defendant's pants, Roberts "came to [defendant's] right front pocket" and "felt something in the pocket." The object was "hard and cylindrical, and [Roberts] asked him what it was." Defendant replied that it was a marijuana pipe.

Roberts asked for permission to retrieve the pipe from defendant's pants pocket, and defendant authorized him to do so. Roberts then asked defendant whether he had any drugs on him. Defendant said, "Oh, shit," which Roberts took as an admission that he did. Roberts continued the pat-down and came upon a bulge in a coin pocket of the pants. Roberts asked for permission to go into that pocket, and defendant said, "Sure." By that time, Roberts suspected that the bulge was "dope" because it is common to find drugs in that kind of coin pocket. Roberts retrieved what turned out to be methamphetamine. He arrested defendant, handcuffed him, and read him his *Miranda* rights.

Defendant said that he understood his rights, and Roberts proceeded to ask defendant how long he had been selling drugs and what he was charging. Defendant explained that he was trying to make a small amount of money by "turning over a little bit of dope" and that he had bought the methamphetamine from a local drug dealer for $50 and had repackaged it into bags that he intended to sell for $20 each. He also admitted to possessing scales and packaging materials in his nearby apartment, which he gave Roberts and Officer Nguyen, who had just arrived on the scene, permission to search. At the apartment, he directed the officers to a drawer that contained digital scales, straws, a razor blade, and a glass pipe with methamphetamine residue.

Defendant was subsequently charged with unlawful delivery, manufacture, and possession of methamphetamine. Before trial, he moved to suppress all physical evidence and statements obtained after Roberts encountered defendant and proceeded to pat him down. Defendant argued that, by walking up to defendant and immediately requesting consent to pat him down for weapons or contraband, Roberts had stopped him without any reasonable suspicion of criminal activity, thereby violating defendant's rights under Article I, section 9, of the Oregon Constitution. Alternatively, defendant contended that, if that initial encounter was not a stop, Roberts at the very least stopped him during the course of the patdown, when defendant was in the "frisk" position and Roberts found the marijuana pipe. Defendant contended:

"When an officer is standing there and you have your hands on your head and he's got his hand in your pocket and pulls out drug paraphernalia, it is both objectively reasonable and objectively likely that you would conclude that you're not free to just walk away at that time."

The trial court denied the motion. The key issue, the court explained, was whether a request for consent to a patdown effected a stop for purposes of Article I, section 9. The court, after canvassing the relevant case law, concluded, "There is no case law that I'm aware of that specifically prohibits a police officer from requesting consent to conduct a search or requesting consent for someone to engage in a stop." The court then rejected the contention that defendant was illegally stopped during the course of the patdown. At the point Roberts discovered the marijuana pipe, the court ruled, "it's still consensual." Defendant was subsequently convicted on all charges.

On appeal, defendant reprises and, to some degree, refines his contention that he was illegally stopped. He contends that, for purposes of Article I, section 9, he was illegally stopped (1) when Roberts encountered him on the street and, without any suspicion of criminal activity, requested consent to pat him down; (2) when Roberts forcibly restrained him during the patdown by placing his hand on defendant's interlaced hands; or at the very latest, (3) when, in the course of the patdown, Roberts "felt a cylindrical object in defendant's pants pocket and asked what it was."[1]

Defendant's initial argument—that he was stopped when Roberts sought his consent to a patdown—is foreclosed by *Ashbaugh*, which the court decided after defendant filed his opening brief. In *Ashbaugh*, the court considered, among other questions, whether the defendant, whose husband had just been arrested, was seized when police "approached her and questioned her about the contents of her purse." 349 Or at 308. The defendant argued that the police questioning, which included a request for permission to search her purse,

---

[1] Defendant also makes passing reference in his opening brief to the Fourth Amendment to the United States Constitution, but develops no separate argument under the federal constitution. We therefore decline to address any federal constitutional issues.

was an illegal seizure; the state, for its part, argued that the "question and request were 'mere conversation,' not a 'seizure.'" *Id.*

The issue in *Ashbaugh*—"whether a putatively unreasonable 'seizure' was in fact 'mere conversation' with no constitutional implications"—was, in the court's words, "a familiar one." *Id.* The court described the well trod constitutional ground of police-citizen encounters, explaining that "[t]he thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309 (citing *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), and *State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978)).

The court then recited the oft-repeated definition of the term "seizure" in *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991):

> "[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances."

*Ashbaugh*, 349 Or at 309. The court, however, took the opportunity to "abandon forthrightly the subjective component" of part (b) of that test, and then restated the definition of a "seizure" as follows:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Id.* at 316 (emphasis in original).

Applying that standard to the facts in *Ashbaugh*, the court concluded that the defendant had not been seized

within the meaning of Article I, section 9, when an officer asked her whether she had anything illegal in her purse, she said that she did not, and the officer then asked for permission to search her purse. *Id.* at 302, 317. The court explained that, "[a]lthough it is possible to restrict a person's liberty and freedom of movement by purely verbal means," the content of the officer's questions—albeit not questions that one citizen would ordinarily ask another—was nonetheless insufficient to be perceived as a show of authority. *Id.* at 317. Likewise, nothing in the officer's "manner or actions" involved a show of authority; the trial court found, and the Supreme Court was therefore bound by the finding, that the conversation between the officer and the defendant was " 'relaxed and nonconfrontational.' " *Id.* Accordingly, the court rejected the defendant's contention that the officer's "questions about the contents of her purse and his request for consent to search the purse amounted to a seizure for purposes of Article I, section 9." *Id.* at 318.

Defendant makes no effort to distinguish the questions and request for consent in *Ashbaugh* from his initial encounter with Roberts, or to explain what further "show of authority" Roberts made when he asked for consent to pat-down defendant.[2] If anything, Roberts's questions involved *less* of a show of authority than the questions in *Ashbaugh*, a case in which police had recontacted the defendant shortly after arresting her husband. Here, by contrast, Roberts, unaccompanied by other officers, simply walked up to defendant on the street, asked if he could talk with him, and then asked if he could pat him down. That, obviously, is not the type of encounter private citizens ordinarily have with one another, but that is not the test under Article I, section 9. The question is whether there was a "show of authority" such that a reasonable person would believe his or her freedom of movement had been restrained, and here, as in *Ashbaugh*, defendant cannot point to anything in the content of the officer's request or his manner ("casual" and "noncoercive,"

---

[2] As previously noted, *Ashbaugh* was decided after defendant filed his opening brief in this case. Defendant addressed *Ashbaugh* in a reply brief but took the position that his arguments on appeal were not "materially affected by the Supreme Court's decision in *Ashbaugh*."

according the trial court) that could be construed as threatening or coercive. Under *Ashbaugh*, Roberts's request for consent to a patdown was "mere conversation," not a seizure.

Defendant's fallback arguments—that he was illegally stopped in the course of the patdown—fail for the reason that the trial court gave: Defendant *consented* to the patdown and never withdrew consent. Defendant's liberty and freedom of movement were not restricted by any show of authority or physical restraint during the patdown; rather, defendant's liberty and movement were restricted because he *consented to a restriction*. Defendant never withdrew his consent, nor can he point to any police conduct during the course of the patdown that would vitiate his consent. There is nothing in the record to suggest that Roberts acted outside the scope of the consent at any point during the patdown, or even that a reasonable person in defendant's position would have understood that the nature of the patdown changed from a consent search to a stop—*i.e.*, that he could no longer withdraw his consent and walk away.

In sum, defendant was not unlawfully seized when he consented to a patdown, and the trial court did not err in denying his motion to suppress the evidence that was subsequently discovered.

Affirmed.