Argued and submitted May 30, 2012, A145681 and A145682 reversed and remanded April 24, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DOUGLAS AARON BERTHA, JR.,
aka Douglas Bertha, Jr.,
aka Douglas A. Bertha, Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
100342905, 060633254;
A145681 (Control), A145682

300 P3d 265

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Brewer, Judge pro tempore.

SERCOMBE, J.

**SERCOMBE, J.**

This consolidated appeal involves two cases: the first case (the 2010 case) concerns defendant's April 2010 convictions, following a trial on stipulated facts, for unlawful entry into a motor vehicle, ORS 164.272, and second-degree theft, ORS 164.045. The second case (the 2006 case) concerns, as pertinent here, the resultant revocation of defendant's probation and imposition of additional terms of incarceration on defendant's prior 2006 convictions due to his "new criminal conduct" in connection with the 2010 case.

Defendant first appeals the April 2010 judgment of conviction, assigning error to the trial court's denial of his motion to suppress evidence obtained after police entered his home without a warrant in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Specifically, he argues that the court erroneously determined that (1) one of the home's occupants consented to the warrantless entry merely by moving out of the way just before an officer walked through the doorway with his weapon drawn and (2) a second person, also a suspect, consented to the search by walking toward that same officer as he stood in the doorway. That is, challenging the trial court's determination that "[t]here was consent by conduct[,]" he asserts that, "[a]t most, the people in the home *acquiesced* to the officer['s] armed entry into the home."[1] (Emphasis added.) Addressing defendant's first argument, the state responds that the occupant in question moved out of the doorway "without being prompted and before the officer tried to enter[,]" thereby voluntarily consenting to the officer's entry.[2]

---

[1] The trial court found that there were "clearly no exigent circumstances" justifying entry, and, on appeal, the state neither contests that conclusion nor advances any argument regarding exigent circumstances.

[2] The state offers no argument on appeal regarding the second suspect's conduct as it relates to the issue of consent, and it is unclear whether the trial court in fact based its ruling on that conduct. Regardless, to the extent that the trial court concluded that the second suspect's conduct constituted consent, we reject that conclusion because, as illustrated in our opinion, the suspect was merely walking forward in response to an armed police officer's directive to do so. *Cf. State v. Berg*, 223 Or App 387, 392, 196 P3d 547 (2008), *adh'd to as modified on recons*, 228 Or App 754, 208 P3d 1006, *rev den*, 346 Or 361 (2009) (noting that voluntary consent is not given where a person complies with "'the language of a command'" (quoting *State v. Lowe*, 144 Or App 313, 318, 926 P2d 332 (1996))).

Defendant next appeals the order and judgment—issued on the same date as the judgment in the 2010 case—revoking his probation and imposing 24 months' additional incarceration on the convictions in the 2006 case. He assigns error to the trial court's denial of his motion to dismiss and terminate probation, asserting that the court earlier extended his probation "without securing a valid waiver of his right to a hearing with counsel" in violation of both Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. In other words, defendant contends that he should not have been on probation at all in 2010 because the order extending his probation beyond November 2009, when it was originally set to expire, was constitutionally invalid. The state responds, first, that defendant's argument to that effect constitutes an impermissible collateral attack on the earlier, appealable order extending his probation. On the merits, it contends that defendant's prior experience with the criminal justice system supports a finding that he understood his right to counsel and thus "knowingly waived the right to have counsel assist him at a probation violation hearing" before the order extending his probation issued.

As to the first assignment of error, we agree with defendant and, accordingly, reverse and remand. Given that disposition, we reverse the order and judgment addressed by defendant's second assignment of error because, absent defendant's conviction in the 2010 case, no "new criminal conduct" exists that would permit the imposition of probation revocation sanctions in the 2006 case.

We review a trial court's denial of a motion to suppress for legal error and defer to its findings of fact provided that there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Absent express findings of fact, and where there is evidence in the record based upon which disputed factual issues could be decided in more than one way, we presume that the trial court decided the facts in a manner consistent with its ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

On March 11, 2010, Multnomah County Sheriff's Deputy Tyrus was dispatched to a Wal-Mart parking lot due to a reported vehicle break-in. Upon arrival, Tyrus spoke with the victim, who confirmed the break-in and reported that an electric "Skilsaw," a bottle of medication, two credit cards, and over $100 worth of groceries had been stolen out of his red Ford Explorer. Tyrus then spoke with the security officer on duty at Wal-Mart, who provided him with a surveillance video of the parking lot. That video depicted, in relevant part, two people entering Wal-Mart, leaving, stopping at the victim's red Ford Explorer, removing the items in question from it, and then leaving the parking lot through a hole in a fence leading to an adjacent mobile home park. Each person in the surveillance video was wearing a distinctive article of clothing; one person was wearing a black hooded sweatshirt associated with the University of Oregon, with the word "Oregon" printed repeatedly over the entire sweatshirt, and the other was wearing a New York Yankees baseball cap "with a really unique design on it" consisting of a "diamonds and sparkles kind of thing." After viewing the video, Tyrus obtained a printed copy of a still-frame image depicting one of the suspects' faces. He then contacted deputies Lazzini and Reed for assistance, as he knew that they "had contacts within the area."

When Lazzini and Reed arrived, all three officers went to the mobile home park and showed the still-frame image to the officers' unnamed contact there. The contact identified the suspect depicted in that image, defendant, as "DJ" and directed the officers to defendant's residence. The three officers proceeded to that residence, and Tyrus knocked on the front door. A woman later identified as Fuller opened the door, having just woken up, and Tyrus asked her, "[Are] there two guys here?" Immediately after asking that question, and while positioned "to the side of the door" for safety reasons, Tyrus observed "one of the suspects that [he] recognize[d] from the [Wal-Mart surveillance] video"—still wearing the distinctive New York Yankees hat—walking out of the kitchen. The suspect, later identified as Pipgrass, was carrying a plate of food and a large kitchen knife.

At that point, Tyrus—still just outside the door-frame—ceased interaction with Fuller, drew his gun, and

commanded Pipgrass to put down the food and knife and "get his hands up." Pipgrass complied, Tyrus motioned for Pipgrass to walk toward him, and, as Pipgrass did so, Tyrus yelled, "Where's DJ?" Immediately thereafter, Tyrus heard a voice from an adjacent room ask, "Who the fuck is looking for DJ?" Tyrus responded, "This is the police[,]" and proceeded to enter the home with his gun drawn, followed by Reed.[3] According to Tyrus's testimony, the sequence of events occurred "[p]retty quick[,]" and Fuller "g[ot] out of the way" by "slid[ing] over" against the wall just before Tyrus entered the home and as Pipgrass was moving toward the doorway pursuant to Tyrus's instructions. More specifically, Tyrus's testimony indicates that Fuller "moved against the wall" in her effort to "get[ ] out of the way" just after Tyrus— gun drawn—yelled, "Where's DJ?" while interacting with Pipgrass immediately before entering the home. For her part, Fuller testified that, upon seeing Pipgrass walk out of the kitchen, the officers, led by Tyrus, began "shoving their way in." At no point did any of the officers request Fuller's consent to enter the home.

After stepping through the doorway, Tyrus saw defendant "building like an entertainment center in the living room off to the left." Defendant then walked around a couch toward the officers, and Tyrus recognized him as the second suspect depicted in the surveillance video and still-frame image. Tyrus and Reed immediately arrested and handcuffed defendant and Pipgrass, both of whom "totally followed orders and were compliant" with the officers' directives. Tyrus ordered Pipgrass to sit on a couch, and in doing so he observed the distinctive University of Oregon sweatshirt depicted in the surveillance video lying on top of that couch. In order to separate the suspects, Reed immediately took defendant outside; Lazzini then seated him on a bench and read him his *Miranda* rights. Ultimately, defendant confessed to the crime, and the property stolen from the red Ford Explorer was found in his bedroom.[4]

---

[3] No evidence was adduced as to whether Reed also drew his weapon as Fuller stood in the doorway while Tyrus interacted with Pipgrass or as he and Tyrus entered the home. Tyrus, given his position in front of Reed, simply testified, "I don't know."

[4] The record does not provide any information regarding the apparent search of defendant's bedroom—nor is it clear regarding the particulars of defendant's

After being charged with unlawful entry into a motor vehicle and second-degree theft in connection with the events of March 11, 2010, defendant moved to suppress "all oral and physical evidence obtained after the officers entered defendant's home." A hearing was held on April 15, 2010, at which defendant argued that, among other things, the evidence should have been suppressed due to the officers' "illegal entry" into his home—that is, because the officers "entered his home without consent, exigent circumstances or an arrest warrant." The state principally argued that exigent circumstances justified the officers' entry into defendant's home. Alternatively, it argued that Fuller's "conduct in this particular case gave consent" and further posited that Pipgrass may have been "meeting [Tyrus] halfway" and thus consenting to Tyrus's entry when Pipgrass moved forward in response to Tyrus's gesture requesting that he do so. Defendant objected to the state's argument regarding Fuller's purported consent, but the trial court ultimately denied defendant's motion on that basis, concluding, as noted, that consent to enter the home had been manifested "by conduct."[5] Defendant was then convicted on both charges following a trial on stipulated facts.

On appeal, defendant reprises his contentions below, arguing that "[a]ll [oral and physical] evidence derived from the unlawful entry and arrest should have been suppressed" due to the officers' purportedly unlawful entry into his home in violation of both Article I, section 9, and the Fourth Amendment. He contends that the trial court erred in concluding that there was consent "by conduct" and argues that, at best, Fuller's actions constituted "mere acquiescence" to the officers' authority. That is, defendant argues, Fuller

confession. Below, the parties put forth conflicting evidence as to whether Lazzini asked defendant if he understood his rights after Lazzini read him the *Miranda* warnings; although it was not noted in her report, Lazzini testified that defendant stated that he understood his rights, while defendant testified that, immediately after Lazzini read the warnings, she asked "[i]f [defendant] wanted to talk about it." In any event, the record indicates only that defendant agreed to talk with Lazzini, initially expressed confusion as to why he was being arrested, and then—at some unspecified point in time—confessed.

[5] As noted, the trial court did not specifically attribute the consent "by conduct" to either Fuller or Pipgrass. However, on appeal the state addresses only Fuller's conduct, and, as set forth above, to the extent that the trial court concluded that Pipgrass voluntarily consented to Tyrus's entry, we reject that conclusion.

merely "stepped out of the way" of an officer wielding a gun and interacting with a suspect located directly behind her—an act that did not provide Tyrus or Reed with consent to enter the home. The state responds to defendant's first assignment of error solely by arguing that Fuller consented to the officers' entry when she "stepp[ed] out of the doorway without being prompted and *before* the officer tried to enter." (Emphasis added.) Specifically, the state emphasizes that, during the chain of events described above, Fuller had already moved "out of the way" when Tyrus took his first step into the home.

We conclude that Fuller's actions did not, as a matter of law, constitute consent to the officers' entry. Rather, as defendant correctly asserts, Fuller's sliding against the wall—out of the line of fire—at best amounted to "mere acquiescence" to police authority. *See State v. Jepson,* 254 Or App 290, 294, 292 P3d 660 (2012) ("[A] defendant's 'mere acquiescence' to police authority does not constitute consent[.]" (Citations omitted.)). And, although the record supports the state's assertion that Fuller moved aside before Tyrus took his first step into the home, that fact does not convert Fuller's actions into consent under these circumstances. In effect, the state's argument boils down to a conclusion that, by the "act" of *not* blocking the doorway—*i.e.*, declining to stand between a loaded gun and a criminal suspect—Fuller consented to the officers' entry. That conclusion is not supported by the record, case law, or common sense.

As this court noted in *State v. Martin,* 222 Or App 138, 143, 193 P3d 993 (2008), *rev den,* 345 Or 690 (2009), "whether a defendant consents to police entry when she opens a door and then retreats *depends on the particular facts in each case.*" (Emphasis added.) *See also State v. Doyle,* 186 Or App 504, 510-11, 63 P3d 1253, *rev den,* 335 Or 655 (2003) ("At most, in failing to immediately object, defendant acquiesced [to] the officers' entry. Her silence did not establish that she had consented to that entry from the outset."). We did acknowledge in *Martin* that "[w]e can imagine situations in which [opening a door and retreating] would amount to a tacit invitation to enter" and in fact noted that the "defendant's actions might have sent an

ambiguous message[.]" 222 Or App at 143-44. However, after considering "all of the circumstances"—most prominently "the crucial fact * * * that, after opening the door, [the] defendant—completely unclothed—*ran away and retreated* into her bedroom"—we held that the defendant's actions did not amount to anything more than "passive acquiescence." *Id.* at 144 (emphasis added).

"[T]he particular facts in [this] case"—considering "all of the circumstances"—are far less ambiguous than those in *Martin*. Notably, Tyrus himself explicitly acknowledged at the hearing that Fuller was "getting out of the way" (that is, "retreat[ing]") when she stepped out of the line of fire by "slid[ing] over" against the wall during Tyrus's interaction with Pipgrass. Moreover, as we recently reiterated in *Jepson*, mere acquiescence "'occurs when an individual is not given a reasonable opportunity to choose to consent * * *.'" 254 Or App at 294-95 (quoting *Berg*, 223 Or App at 392); *see State v. Guzman*, 164 Or App 90, 99, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000) (similar). Here, Fuller woke up and opened the door in response to a knock, remained in the doorway very briefly as a rapid series of events involving an armed officer's confrontation with a suspect unfolded, and then slid against a hallway wall—out of the line of fire—in her effort to get "out of the way." That conduct is most appropriately characterized as an attempt to get out of harm's way rather than a tacit manifestation of consent to Tyrus's entry.[6] On those facts, particularly given that the events preceding the officers' entry occurred quickly (and primarily involved interaction between Tyrus and Pipgrass), we cannot conclude that Fuller was "given a reasonable opportunity to choose to consent." *Jepson*, 254 Or App at 294-95 (citation and internal quotation marks omitted). Rather, the only choice with which she was presented given the rapid progression of events was whether to remain between a loaded gun and a criminal suspect.

---

[6] On that point, the record suggests that Fuller slid against the wall just after Tyrus *"yelled* to [Pipgrass], 'Where's DJ?'" (Emphasis added.) In other words, Fuller slid against the wall as the situation began to escalate. Moreover, given Pipgrass's location behind Fuller, the sequence of events suggests that Tyrus effectively "yelled" at *Fuller*.

In sum, considering "all of the circumstances" and "the particular facts in [this] case"—namely the fact that Tyrus drew his gun and was engaged with a suspect directly behind Fuller, the short time frame during which the events occurred, and the fact that Fuller's consent was never requested—we conclude that the state has not demonstrated "that [Fuller's] actions amounted to anything more than passive acquiescence." *Martin*, 222 Or App at 144.

Accordingly, the officers unlawfully entered defendant's home without a warrant in violation of Article I, section 9. The trial court therefore erred in denying defendant's motion to suppress the evidence derived from that unlawful entry.[7] *Cf. State v. Davis*, 295 Or 227, 243, 666 P2d 802 (1983) ("Having determined that the entry was unlawful, we need not address the subsequent searches and seizures as they are the direct consequence of the unlawful entry.").

A145681 and A145682 reversed and remanded.

---

[7] The state neither argued below nor argues on appeal that defendant's confession to Lazzini, made after administration of *Miranda* warnings, was sufficiently attenuated from the unlawful entry and arrest such that it is admissible. Accordingly, we do not address that issue.