Submitted December 19, 2013, affirmed August 20, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JULIAN BLEU WABINGA,
*Defendant-Appellant.*

Multnomah County Circuit Court
110632633; A150253

333 P3d 1213

Peter Gartlan, Chief Defender, and Erik Blumenthal, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Defendant appeals a judgment of conviction for one count of unlawful possession of cocaine, ORS 475.884. He assigns error to the trial court's denial of his motion to suppress evidence, contending that the officers seized him without reasonable suspicion. We affirm.

We review the trial court's denial of a motion to suppress for legal error, and we defer to the trial court's findings of historical fact if they are supported by constitutionally sufficient evidence in the record. *State v. Bertha*, 256 Or App 375, 378, 300 P3d 265 (2013). In the absence of express findings, any factual disputes are resolved in a manner consistent with the trial court's ultimate conclusion. *Id.* In light of that standard, the facts are as follows.

On a February afternoon, Oregon State Police Trooper Fromme and Senior Trooper Richardson of the Fish and Wildlife Division were patrolling the Sandy River area of Highway 30 in an Oregon State Police truck demarcated "with a star on the side" and the words "Oregon State Police Trooper" on both doors. The troopers were enforcing fish and wildlife laws, ensuring that anglers had fishing licenses, and performing welfare checks on disabled motorists. Both troopers wore a "field uniform," consisting of cargo pants, a badge hanging from the shirt, and a ball cap marked with "Oregon State Trooper."

Noticing a car pulled off to the side of the road, the troopers parked in a gravel pullout approximately two car-lengths behind a Nissan 280Z. The car appeared to be empty. The troopers did not activate the truck's emergency lights or use the loudspeaker. Richardson immediately ran the car's license plate on the in-truck computer.[1] After having been parked for a few moments, the troopers saw "a head come up in the driver's seat." Fromme approached the driver's side of the car and saw that the door was slightly ajar. Fromme then inquired of the occupant—defendant—"if he was okay [and] if his car was running." In lieu of a response

---

[1] Although the record contains minimal information about what Richardson learned from the computer search, it does reveal that Richardson learned that the vehicle's owner was on parole.

and without prompting from Fromme, defendant got out of his car and shut the door. Fromme stepped back to accommodate defendant's movement and then followed defendant to the rear of his car.

Upon reaching the rear of defendant's car, Fromme again asked if defendant needed assistance. Defendant responded that he "did not and that he was just chillin[']." Fromme continued to talk with defendant about various topics, including fishing. During the course of the conversation, defendant did not make eye contact with Fromme, repeatedly drank from an apparently empty soda can, kept one hand in his pocket, and exhibited an unusual degree of nervousness. Fromme asked defendant, "'Are you nervous[?]' and, 'Why are you so nervous[?]'" Defendant responded that he was not nervous.

At that point, Richardson got out of the patrol truck and stood near Fromme and defendant. The troopers, while continuing to question and talk to defendant, stood approximately three feet away from defendant. Neither trooper blocked defendant's ability to leave or walk to the front of his car. Richardson then asked defendant if he had any weapons and requested defendant's permission to do a patdown search. Defendant consented, and Richardson conducted the search.

Meanwhile, Fromme began walking toward the front of defendant's car. After walking up to the window, Fromme asked defendant if he "had ever been contacted by police." At that point, Richardson asked whether defendant was "'still on a parole status.'" Defendant responded that he was.

When Fromme reached the driver's-side door of defendant's car, he looked through the window and saw a "thick plastic tube sitting on the floorboard of the driver's seat" and Fromme testified that it looked like it had been "shoved underneath the seat but you could see it from standing near the window." Based on Fromme's training and experience, he believed that it was "a tube or a device used to catch the smoke off burning narcotics" and that, if it had been used for that purpose, it would contain the residue of a controlled substance.

Fromme asked defendant what the tube was. Defendant "broke[] contact" with Richardson and "walked pretty quickly to [Fromme's] location, from the rear of the car to the window, and looked in the vehicle with [Fromme] and asked [Fromme] what [he] was * * * asking about." Fromme pointed to the object several times before drawing defendant's attention to it. Defendant denied knowing what it was.

Fromme then asked permission to open the door and look at the tube. Defendant said that "he didn't have a problem with that." For officer-safety reasons, before opening the door and searching the vehicle, Fromme asked defendant to step back. Defendant did so. Fromme then asked defendant to go stand at the rear of the car with Richardson, and defendant complied. Fromme later explained that, for safety reasons, he would not have begun the search of defendant's car with defendant in such close proximity.

Fromme then retrieved the tube. It contained a crystalline substance with a brownish tint, which, based on Fromme's experience, he believed to be narcotics. Fromme inspected the tube and brought it to Richardson. Fromme then saw defendant take something white out of his pocket and throw it behind him toward the river.

Fromme immediately told defendant to "not make any movements," turn around, and put his hands behind his back. Fromme placed defendant under arrest and handcuffed him. Fromme could see that defendant had thrown a clear "plastic sandwich baggie with * * * something white inside, powder or some white substance." Richardson retrieved the bag. Fromme believed that the bag contained cocaine or powdered methamphetamine. Richardson then gave defendant *Miranda* warnings.

Defendant filed a pretrial motion to suppress all evidence obtained as a result of what he contended was an unlawful seizure during the encounter. The trial court concluded that the troopers acquired reasonable suspicion of criminal activity when Fromme saw the tube through the car window and recognized it as a drug-related item. After concluding that the troopers' actions did not rise to the level of a stop before that point, the trial court denied

the suppression motion. Defendant subsequently waived his right to a jury trial, and the trial court found him guilty after a stipulated facts trial.

On appeal, defendant asserts that the trial court erred when it denied his suppression motion, contending that the troopers' actions leading up to Fromme's identification of the tube through the window constituted a show of authority that resulted in defendant's seizure. Specifically, defendant asserts that the troopers seized him by continuing to question him—after he had indicated that he was not in need of police assistance—about whether he was on parole, was nervous, and whether he possessed weapons, and asking him to consent to a patdown search (and conducting that search). The state, for its part, contends that the troopers did not stop defendant until *after* they had developed reasonable suspicion of criminal activity.

We begin by setting forth the relevant legal framework. Under Article I, section 9, of the Oregon Constitution,[2] "encounters between law enforcement officers and citizens are of an infinite variety. Of that infinite variety, only some implicate the prohibition in Article I, section 9, against unreasonable seizures." *State v. Backstrand*, 354 Or 392, 398-99, 313 P3d 1084 (2013) (internal quotation marks and citations omitted). A person is "seized" "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis in original); *see also Backstrand*, 354 Or at 399 n 8 (declining to reconsider *Ashbaugh* test). A "stop" is a "temporary" seizure. *Id.* at 399. "[I]n practice, the line between a mere encounter and something that rises to the level of a seizure does not lend itself to easy demarcation." *Id.* (internal quotation marks omitted). An officer's actions may cross that line when the officer engages in actions or behaviors "that, explicitly or implicitly,

---

[2] Article I, section 9, provides, as relevant here, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

reasonably convey[] to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Anderson*, 354 Or 440, 450, 313 P3d 1113 (2013).

Defendant advances several theories about when the officers engaged in a constitutionally significant "show of authority" that resulted in his seizure. We begin with defendant's first contention, that the troopers' actions, in continuing to question him after he indicated that he did not need police assistance, constituted a show of authority.

Generally, when examining whether law enforcement officers have engaged in a show of authority, we examine the nature of the officer's questions, behaviors, and actions, the tone of the encounter, and other attendant circumstances. *Anderson*, 354 Or at 453 ("[T]he question is whether the content of the officers' requests, the manner in which they were made, or the overall context of the contact elevated the encounter to the level of a seizure by conveying * * * that the officers would not allow [the defendant] to leave."). Whether a show of authority has occurred "necessarily is fact-specific and requires an examination of the totality of the circumstances involved." *Backstrand*, 354 Or at 399.

As the Supreme Court recently instructed, verbal inquiries are not *per se* "a coercive[] restrain[t on] the person's liberty or freedom of movement." *Id.* at 412; *State v. Highley*, 354 Or 459, 471, 313 P3d 1068 (2013). Because "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens," we have held that, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful," *Backstrand*, 354 Or at 400 (internal quotation marks omitted).

Indeed, an officer's verbal inquiries to a private citizen, by themselves, generally do not constitute seizures. Instead, to constitute a show of authority, "something more than just asking a question, requesting information, or

seeking an individual's cooperation is required." *Backstrand*, 354 Or at 403. According to the Supreme Court, the "something more can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a threatening or coercive show of authority requiring compliance with the officer's request." *Id.* at 403 (internal quotation marks omitted).

In this case, the troopers questioned defendant, discussing general topics in addition to asking defendant questions about what he was doing in the area, why he was nervous, whether he was on parole, and whether he possessed any weapons. The troopers' manner of questioning did not change throughout the encounter, *i.e.*, the encounter remained nonconfrontational. Thus, none of the troopers' actions—asking whether defendant was nervous, possessed weapons, or was on parole—could reasonably be construed as a "threatening or coercive show of authority requiring compliance with the officer's request." *Id.* (internal quotation marks omitted); *see Highley*, 354 Or at 462-63 (holding that the defendant had not been unlawfully seized when an officer approached him in a parking lot, inquired as to whether he was "still on probation," asked for his identification, returned the identification, and then radioed dispatch to confirm the defendant's probation status); *State v. Beasley*, 263 Or App 29, 35, 326 P3d 634 (2014) (concluding that the facts did not support an objectively reasonable belief that the defendant's liberty was restricted in a constitutionally significant manner by the officer's contact when the officer, in a "casual tone," asked for the defendant's identification and, while retaining it, inquired about whether he was on probation or had any warrants and if he could run a records check). Thus, without more, defendant's argument—that he was seized based on the troopers' continued questioning—fails.[3]

---

[3] We similarly reject defendant's assertion that the troopers' uniforms and official police vehicle were the "something more" which transformed the encounter into a stop. A troopers' official status, by itself, is generally insufficient to create a "show of authority." *Backstrand*, 354 Or at 400-01. Moreover, the fact that the citizen feels discomfort when approached by an officer, or by the officer's inherent authority, does not transform the contact into a constitutionally significant seizure. *Anderson*, 354 Or at 450.

We turn to defendant's second contention, that Richardson's request to conduct a patdown and the act of the patdown itself constituted shows of authority that effected his seizure.

In *State v. Kinkade*, 247 Or App 595, 270 P3d 371 (2012), we concluded that a defendant was not illegally seized *before* he consented to a patdown, noting that "the content of the officer's questions—albeit not questions that one citizen would ordinarily ask another" did not create a show of authority because "the conversation between the officer and the defendant was relaxed and nonconfrontational." *Id.* at 601 (internal quotation marks omitted.) We further rejected the defendant's argument that he was illegally seized *during* the patdown, because he never renounced or withdrew his consent (and did not challenge the voluntariness of his consent). *Id.* at 597. In short, a defendant is not necessarily seized if he consents to a patdown or search: the "[d]efendant's liberty and freedom of movement [a]re not restricted by any show of authority or physical restraint * * *; rather, [the] defendant's liberty and movement [a]re restricted because he consented to a restriction." *Id.* at 602 (emphasis omitted). The same is true in this case. Although defendant argues that he was stopped when Richardson requested consent to do a patdown search (and conducted the search based on defendant's consent), defendant did not withdraw or renounce that consent at any time during the encounter, and defendant does not challenge the voluntariness of that consent on appeal. *See Highley*, 354 Or at 471, 473 (concluding that the officer did not stop the defendant when the officer requested consent to conduct a patdown search, because the defendant consented to show the officer what was in his pockets, and the defendant did not challenge the voluntariness of that consent on appeal). We reject defendant's argument that he was seized by the officer's request for consent to conduct a patdown.

Based on the totality of the circumstances, we conclude that, based on the nonconfrontational nature of the encounter—including the troopers' questioning and requests for consent to search, defendant's consent to those searches, and his compliance with the troopers' requests—when viewing the circumstances in concert with one another, the

troopers' actions before Fromme identified the tube did not create a whole greater than the sum of its parts and thus could not reasonably be construed as threatening or coercive. *State v. Charles*, 263 Or App 578, 585, 331 P3d 1012 (2014) (in determining whether a defendant was seized, we do not examine each of the officer's actions separately, but instead analyze "whether all of the officer's actions combine to form a whole greater than the sum of its parts; that is, whether, based on the totality of the circumstances, a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement"). Indeed, viewing the totality of the circumstances of the encounter, we conclude that the stop occurred when Fromme ordered defendant not to move and to put his hands behind his back after seeing the tube and seeing defendant take something out of his pocket and throw it toward the river.

Having so concluded, we turn to examine defendant's final argument that, when the officers told defendant not to move and to put his hands behind his back, the troopers lacked reasonable suspicion to support the stop. For the following reasons, we reject defendant's argument and conclude that the troopers had reasonable suspicion to support the stop.

> "A stop of a person by a police officer is supported by reasonable suspicion when the officer subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop."

*State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013). Reasonable suspicion "does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010). "An officer's training and experience are relevant to, and may help explain why, a particular circumstance is suspicious." *State v. Alvarado*, 257 Or App 612, 631, 307 P3d 540 (2013). Here, Fromme testified that he believed that the tube in defendant's car was used to smoke narcotics, and if it had been so used, it would contain a residue of controlled substance. In determining

whether Fromme's belief was objectively reasonable, we examine "the objective facts known to the officer at the time of the stop." *State v. Frias*, 229 Or App 60, 64, 210 P3d 914 (2009). The officer must "point to specific and articulable facts." *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993).

As Fromme walked over and handed the tube to Richardson, he noticed defendant take something white out of his pocket and throw it behind him, towards the river. Only then did Fromme stop defendant, by ordering him to stop moving and put his hands behind his back. At the time of the stop, Fromme had examined the tube—which appeared to contain drug residue—and had watched defendant throw a white item out of his pocket and toward the river, in an apparent effort to dispose of it. Fromme's observations supported an inference that defendant possessed illegal drugs, and that inference was objectively reasonable under the circumstances. *Hiner*, 240 Or App at 181.

Affirmed.