*461 LINDER, J.
This is the third of three cases that we decide today in which we examine whether a police request and verification of identification is a seizure under Article I, section 9, of the Oregon Constitution.[1] As we will explain, our analysis of this case is largely controlled by our decision today in State v. Backstrand, 354 Or 392, 412-13, 313 P3d 1084 (2013), in which we hold that an officer’s mere request for and verification of identification is not a seizure. Contrary to the Court of Appeals’ resolution of this case, State v. Highley, 219 Or App 100, 110, 180 P3d 1230 (2008), we conclude that the officer did not seize defendant by asking for his identification and checking defendant’s probationary status based on that identification or by asking defendant for consent to search. We, therefore, reverse the decision of the Court of Appeals and affirm the judgment of the trial court.
BACKGROUND
Officer Desmond is a member of the Yamhill County Interagency Narcotics Team. For about two and a half years before this case arose, he had been a member of that team and involved in drug investigations in and around the McMinnville area. On this particular occasion, Desmond was on patrol at 8:30 in the morning when he saw Williamson, someone he knew from past drug arrests and investigations, drive a car into a parking lot between two apartment complexes in McMinnville. Desmond knew that Williamson’s license was suspended, so he followed the car into the parking lot. Williamson parked in an angled parking space near one of the apartment complexes; Desmond parked in the middle of the parking lot some distance away (and so that his patrol car was not blocking Williamson’s car from leaving) without activating his overhead lights. Desmond saw Williamson and two passengers — defendant and Sears — get out of the car. Desmond got out of his car and “said something to get [Williamson’s] attention,” knowing that Williamson would recognize Desmond if Desmond said something to him. *462 In addition to knowing Williamson, Desmond also recognized defendant from past contacts and arrests involving drug activities, and he knew defendant by name. At that point, Desmond did not say anything to defendant or the other passenger because Desmond’s only purpose in pulling into the parking lot was to talk to Williamson. As Desmond and Williamson began talking, defendant and Sears walked away and went to the door of one of the apartments.
Less than a minute later, defendant and Sears returned to Williamson’s car, apparently because no one answered the door at the apartment. When they returned, the two were, in Desmond’s words, “just milling around” the car. Desmond, meanwhile, was still dealing with Williamson, who Desmond thought was on probation. Desmond had called dispatch to verify Williamson’s license status. Desmond also called the probation department to check whether Williamson’s probation officer had any “interest” in the fact that Williamson was in the area of apartments known to have drug activity and was in the company of people known to be involved with drugs and who had gone to an apartment with a history of drug activity, all of which likely violated the conditions of Williamson’s probation.
While Desmond waited for a response from the probation officer, and while defendant and Sears were “kind of just hanging out at the car,” Desmond spoke briefly with defendant and asked him if he was “still on probation.” Defendant told Desmond that he was not. Desmond then asked both defendant and Sears whether they had their identification on them and whether Desmond could look at that identification. Both defendant and Sears handed Desmond their licenses. Desmond took them, wrote down the license numbers, and handed the licenses back. Desmond estimated that he had the licenses for “at the most” between 30 seconds and a minute before returning them to defendant and Sears.
In defendant’s case, Desmond wanted to confirm that defendant was not on probation and could have done that with defendant’s name alone, which Desmond already knew. But Desmond nevertheless asked for the identification because dispatch can check the information more *463 quickly with information from the license. As soon as Desmond handed the licenses back to defendant and Sears, he walked over to his patrol vehicle, leaving defendant and Sears by Williamson’s car. Desmond called dispatch and confirmed that, as defendant had told him, defendant was no longer on probation. While Desmond was in his patrol car, defendant, Williamson, and Sears “were just standing around the vehicle, as they were before, kind of just walking around [.]”
After making the call to dispatch, Desmond returned to where the three were standing. Desmond asked Sears if he would consent to be searched. Sears agreed. Desmond was interested in only a “non-intrusive” search and asked Sears if he would empty his pockets, which “he did willingly.” During that search, a second officer, Officer Fessler arrived. Fessler was there only as a “cover officer” and simply stood by, observing, without otherwise assisting Desmond. The only item of interest that Sears took from his pockets was a black film canister. Desmond asked Sears if he could look inside it, and Sears, in response, opened the canister for Desmond. It appeared to have just water in it. Sears told Desmond that he had found the canister on the ground “on the way to the apartment complex.” Desmond knew that intravenous drug users often carry water with them, but there was nothing illegal about the canister and what it contained, and Desmond was not concerned with it. While Desmond examined what Sears had in his pockets, Desmond did not pay close attention to defendant or to what he was doing.
When Desmond was done examining the film canister and searching Sears’s pockets, Desmond returned briefly to his patrol car. He then walked back to Williamson’s car. Defendant, by then, had moved to the trunk area of the car and was either looking in the open trunk or getting something out of it. Desmond thought that defendant was getting something from the trunk because he realized — and Desmond himself may have told defendant — that the car was going to be towed. Willamson and Sears, meanwhile, remained on the passenger’s side towards the front of the car, where they were — to use Fessler’s term — “chitchatting” with Fessler.
*464 Desmond approached defendant and told defendant that he was right about his probation status. Desmond then asked defendant for consent to search him. Defendant responded by telling Desmond that he would empty his pockets for him. Defendant first showed Desmond what was in his right pocket; nothing in it was of interest to Desmond. Defendant then removed a small, oval-shaped, plastic container from his left pocket. Desmond asked defendant what was in it, and defendant said “some diamonds.” Desmond asked if defendant would open it. Rather than simply show Desmond the contents, defendant responded by opening the container “just slightly” and cupping it in his hand, so that some but not all of what was inside could fall out. What fell out was mostly some “odd jewelry-type items” and what could have been diamonds (Desmond could not tell if they were real). Defendant appeared to be concealing something else in the container by not letting it fall out. Defendant then put the container back in his left pocket.
Desmond asked defendant if he would let Desmond look in the container and in his left pocket, where defendant had put the container. Defendant agreed, and reached into the pocket. He did not take the container out immediately, but instead moved his hand around in the pocket. When Desmond asked him what he was doing, defendant said that he wanted to make sure there was no more jewelry in the container. When Desmond asked again if he could see the container, defendant pulled it out of his pocket. While keeping Desmond to his left, defendant turned away from Desmond and seemed to transfer something from his left hand to his right while keeping the container in his left hand. Defendant then opened and showed the container to Desmond, proving that it was empty.
Fessler during that time was standing on defendant’s right side, about five or six feet away, near the rear quarter panel of the car. Although he had been conversing with Sears and Williamson and only occasionally glancing at Desmond and defendant, Fessler fixed his attention on defendant when he noticed some of the odd movements that defendant was making. Fessler in particular saw defendant “blade” the right side of his body away from Desmond, *465 blocking Desmond’s view of defendant’s right side. Fessler then saw defendant put his right hand in his right pocket and pull it out in a fist. As defendant did that, Fessler noticed “a little small clear plastic [b]aggie *** sticking out the bottom” of defendant’s fist. Fessler suspected that the baggie contained illegal drugs and asked defendant what was in his hand. Defendant started to move away from Fessler, who responded by grabbing defendant’s right wrist. After a struggle, defendant finally opened his hand, which led to the officers’ discovery of two plastic baggies containing methamphetamine.
As stated, defendant moved to suppress all the evidence discovered as a result of the search, arguing that he had been unlawfully seized and that his consent to search was a product of the unlawful seizure. The state responded that Desmond’s conduct in asking defendant for identification and running a check on his probationary status after giving the license back to defendant was not a stop and, thus, not a seizure. If, however, it was a stop, the state contended that Desmond had reasonably suspected that defendant, under the circumstances, might be in possession of drugs. The state also argued that, in any event, the stop ended when Desmond returned the license, completed the check on defendant’s probation, and then “broke contact” with defendant to search Sears pursuant to Sears’s consent. At the point that Desmond returned his attention to defendant, the state urged, defendant gave voluntary consent to search, and the officers acquired cause to detain defendant once Fessler saw what reasonably appeared to be packaging for drugs concealed in defendant’s hand.
In response, defense counsel did not dispute that defendant’s consent to search was voluntary or that the officers acquired sufficient cause to seize defendant when Fessler saw the plastic baggie concealed in defendant’s hand. Defendant argued only that, before defendant gave his consent to search, Desmond had unlawfully detained him by asking him for his identification and taking possession of that license, however briefly, and by asking for consent to search. Defense counsel urged that “there never should have been any inquiry of [defendant]. And this matter should have been over when the contact with the driver w;as over.”
*466 The trial court denied the motion to suppress on two theories. First, the trial court concluded that defendant was seized when Desmond obtained his driver’s license and wrote down the license information, but that that seizure was justified by reasonable suspicion that defendant was involved in criminal activity related to suspected drug use at the apartment that defendant had approached. The trial court also concluded that, in any event, the seizure ended when Desmond returned defendant’s license and walked back to his patrol car. Thus, according to the trial court, the search of defendant’s pockets was lawfully based on defendant’s consent. Although defendant had not argued to the contrary, the trial court further concluded that, when Fessler saw “what looked like a plastic [b] aggie sticking out of [defendant’s] hand or fist[,]” under the circumstances, “it was reasonable to believe that that [b] aggie may contain a controlled substance.” That reasonable belief, in turn, provided Fessler with justification for grabbing defendant’s wrist and “obtaining [the baggie] from his hand.”
On appeal, defendant challenged the denial of his motion, arguing that he was seized unlawfully when Desmond requested, retained, and then ran his license number to check on his probationary status. Defendant also argued that the request for consent to search had amounted to a seizure. Defendant urged that the evidence discovered in the search was the result of “exploitation of the illegal detention” and that his consent to search was not “independent of the illegal detention.” The state responded that the records check did not amount to a seizure because there was no evidence that defendant knew that he was the subject of a records request and no other evidence that would have caused a reasonable person to believe that he or she was restrained from leaving. The state argued in the alternative that, even if there had been a seizure, Desmond did not exploit that seizure to gain defendant’s consent to search. The state conceded that Desmond had no reasonable suspicion to seize defendant before Fessler observed the plastic baggie in defendant’s hand.
The Court of Appeals agreed with defendant that “the request for defendant’s identification, closely followed by the check of defendant’s probationary status, and the *467 request for consent to search defendant, constituted a stop.” Highley, 219 Or App at 110. The court based its decision on cases in which “Oregon appellate courts have concluded that an officer’s action in requesting a defendant’s identification and running a records check was a stop for purposes of Article I, section 9.” Id. at 106 (citing cases). The court concluded that “a reasonable person in defendant’s position would believe that the officer wrote down the identifying information and then immediately returned to his car with that information in order to run some type of records check.” Id. at 108. According to the Court of Appeals, that constituted a seizure because a reasonable person in the circumstances would believe “that he or she is under investigation and is not free to leave.” Id. at 109. The court ultimately concluded that the challenged evidence was obtained as a result of the unlawful seizure and defendant was therefore entitled to suppression. Id. at 111-13. On review, the parties largely renew those arguments, focusing on whether defendant was seized at any point in his encounter with Desmond before the drugs were discovered.[2]
ANALYSIS
As we earlier noted, this case is the third of three decided today in which we examine whether a police request for and verification of identification is a seizure under Article I, section 9. In Backstrand, the first of the three cases, we discuss at length the principles that inform that analysis. 354 Or at 398-413. In Anderson, the second of the three cases, we summarize those principles from Backstrand. 354 Or at 449-52. Our discussion of the legal principles in this case, therefore, is accordingly abbreviated.
As Backstrand reaffirms, not every police-citizen encounter rises to the level of a seizure for constitutional purposes. 354 Or at 400. Rather, “law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or *468 impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.” State v. Holmes, 311 Or 400, 410, 813 P2d 28 (1991). An officer seizes a person only if the officer’s words, manner, or actions would convey to a reasonable person that the officer is exercising his or her authority to restrict the person’s liberty or freedom of movement in a significant way — that is, in a way that exceeds ordinary social boundaries. Id. at 409-10. Verbal police inquiries are not, by themselves, seizures. Backstrand, 354 Or at 403 (citing propositions from State v. Rodgers/Kirkeby, 347 Or 610, 622, 624, 227 P3d 695 (2010)). And in particular, a request for identification does not, without more, convert an encounter between an officer and a citizen that is not a seizure for constitutional purposes into one that is. Id. at 409-10. Nor does an officer’s action in verifying a person’s identification, without more, convert the encounter into a seizure. Id. at 413. As Backstrand explains:
“We see no principled basis for concluding that, when an officer checks the validity of a proffered identity or piece of identification, such an action per se conveys to a reasonable person — who is not otherwise restrained and who has willingly tendered the information to the officer — that the officer is now exercising his or her authority to coercively restrain the person’s liberty or freedom of movement. To be sure, as we have already discussed, a person tendering identification to an officer may not subjectively feel comfortable refusing the officer’s request. Instead, for any number of personal reasons or instincts, the person may be unwilling to decline the officer’s request. Those internalized motivations and feelings are not the test for whether there is a seizure under Article I, section 9. A person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer’s authority to restrain the person’s liberty or freedom of movement. The circumstance is akin to when a person gives valid consent to search. Part and parcel with giving consent is a reasonable person’s expectation that he or she will likely either need or want to stand by while the officer performs the search. The person who waits while a consent search is completed is not thereby seized for purposes of Article I, section 9. So, too, with a *469 person who, in a noncoercive setting, gives an officer his or her identification for the officer’s examination. The fact that the officer conducts that examination is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a coercive restraint on the person’s liberty.”
Id. at 412-13 (emphasis in original) (footnote omitted).
That brings us to this case. Here, defendant does not assert that he was stopped at any point before Desmond asked him for identification. Nor would that contention be availing. Desmond, after parking in the parking lot, called out to Williamson, the driver, and proceeded to talk only to him. While Desmond did that, defendant and Sears were free to go about their activities unrestrained, and they did so. They walked away from where Williamson’s car was parked, went to an apartment, and then returned of their own accord. Desmond said nothing to them and did not even pay much attention to them throughout that time.
After defendant and Sears returned, they chose to “mill” around the car, where Desmond remained with Williamson. As they milled around, Desmond asked defendant if he was still on probation; defendant said that he was not. Desmond then asked both Sears and defendant for identification. That request was, as we conclude in Backstrand and reaffirm in Anderson, a straightforward request for information and cooperation of the kind that this court, since Holmes, has continued to affirm police officers may make without implicating Article I, section 9. Backstrand, 354 Or at 409-10; Anderson, 354 Or at 451. When defendant gave his license to Desmond, and Desmond took possession of it, his choice to cooperate with Desmond’s request did not convert the encounter into a seizure for constitutional purposes.
Nor did what happened immediately after that result in a seizure of defendant. Desmond held defendant’s and Sears’s licenses only briefly — -just long enough to write down the license numbers. Within 30 seconds to a minute, at most, Desmond handed the licenses back. The Court of Appeals, in its discussion, declined to consider “the length of retention of a [person’s] identification * * * the touchstone” or otherwise dispositive of whether a stop has occurred. *470 Highley, 219 Or App at 109. We agree. As we observed in Backstrand, a person who decides to cooperate with an officer’s request for identification reasonably can expect that the officer will do something with that identification, such as seek to verify the person’s identity or status. See Backstrand, 354 Or at 412-13 (officer verified validity of license); State v. Watson, 353 Or 768, 782, 305 P3d 94 (2013) (verification of status of stopped driver’s driving privileges). That the officer either retains the identification for a reasonable time while doing so, or swiftly returns the identification and uses information from it for those purposes, are not actions that transform a noncoercive encounter into one in which the individual’s liberty is significantly restrained through an exercise of coercive police authority. Id.
Rather than convey a restraint on defendant’s liberty, Desmond’s actions affirmatively conveyed the opposite. Defendant, until Desmond engaged him, had walked away and returned of his own accord. Desmond, for his part, after writing down the license numbers, turned and walked away, without doing anything that reasonably would convey that defendant was no longer at liberty to leave. Indeed, defendant in fact then went about his own business, going to the trunk of the car, apparently to remove some personal possessions because he knew that the car was to be towed. When Desmond returned to the car after checking defendant’s probationary status, Desmond did not engage defendant at all. Instead, he talked to Sears and examined what Sears had in his pockets with Sears’s consent and cooperation. Defendant, of his own accord, remained. When Desmond did turn his attention to defendant again, Desmond told defendant that he had confirmed that defendant was not on probation— information that reasonably conveyed that Desmond was not exercising authority over defendant’s liberty.
Desmond then asked if defendant would consent to search, and defendant said that he would show Desmond what was in his pockets. What ensued might be best characterized as a game of “cat and mouse,” in which defendant voiced his willingness to cooperate and took seemingly cooperative actions, while surreptitiously attempting to conceal the methamphetamine that was in his possession. Desmond’s request for consent, and the questions that he *471 asked defendant during the search (e.g., what defendant was doing with his hand in his pocket when he did not remove the container the second time), were verbal inquiries only. They were not seizures. See Rodgers/Kirkeby, 347 Or at 622 (verbal inquiries are not seizures); Ashbaugh, 349 Or at 316-17 (defendant not seized when officers asked her if she had anything illegal in purse and requested consent to search purse).[3]
In short, Desmond’s actions, considered both individually and in combination, did not seize defendant. In concluding that they did, both the trial court and the Court of Appeals relied principally on our decision in State v. Hall, 339 Or 7, 115 P3d 908 (2005). In doing so, however, they misunderstood the holding in Hall.
In Hall, an officer parked his vehicle next to the defendant as the defendant was walking along a street. The officer motioned for the defendant to approach the officer’s vehicle and then got out of his vehicle as the defendant neared. The officer asked to see the defendant’s identification. When the defendant handed his identification to the officer, the officer radioed dispatch and requested a warrant check. While awaiting the results of the warrant check, the officer returned the identification and proceeded to question the defendant about whether he was carrying any weapons, knives, or illegal drugs. The defendant responded in the negative. In response, the officer asked the defendant for consent to search his person, and the defendant consented. The search revealed evidence of unlawful drug possession. Id. at 10-11.
The court in Hall concluded that the encounter began as a noncoercive engagement between the officer and the defendant, but evolved into a seizure in the course of the officer’s investigation. The court explained that the officer’s *472 “initial actions of stopping his vehicle next to [the] defendant and then gesturing for [the] defendant to approach him did not intrude upon [the] defendant’s liberty of movement[.]” Id. at 19. But the court concluded that the nature of the encounter changed when the officer took the defendant’s identification and conducted a warrant check. The court acknowledged that the officer promptly returned the defendant’s identification, but maintained that, at that point, the defendant was aware that he was the subject of a pending warrant check and, because of that fact, it was “difficult to posit” that a reasonable person would have felt free to leave. Id. The court further observed that the officer
“did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check. Instead, immediately upon returning [the] defendant’s identification card, [the officer] questioned [the] defendant about whether [the] defendant was carrying any weapons, knives, or illegal drugs, and he asked [the] defendant for consent to search [his] person.”

Id.

Hall should not be understood, as it appears to have been understood by some advocates and by the Court of Appeals, to stand for the proposition that an officer’s request for identification and a check of that identification, either to determine its validity or the status of the person who tenders it, is a per se stop. See, e.g., Highley, 219 Or App at 106 (citing Hall for proposition that “an officer’s action in requesting a defendant’s identification and running a records check [is] a stop for purposes of Article I, section 9”).[4] Hall was a close case and turned on its specific facts. As Holmes observed, because of the diversity of potential police-citizen encounters, determining when an encounter between an officer and a citizen is a seizure for constitutional purposes is necessarily a fact-specific exercise and requires an examination of the totality of the circumstances involved. 311 Or at 408. And more recently, we have acknowledged that, “in practice, the *473 line between a ‘mere encounter’ and something that rises to the level of a ‘seizure’ does not lend itself to easy demarcation.” State v. Fair, 353 Or 588, 595, 302 P3d 417 (2013). In Hall, none of the officer’s actions (hailing defendant, asking for identification, checking that identification, asking about weapons and drugs, asking for consent) individually was sufficient to amount to a stop. In combination, however, the court in Hall concluded that those actions crossed over the line and transformed what began as a mere encounter into a stop.
No similar alchemy occurred here. None of Desmond’s actions — the request for identification, the check of defendant’s probationary status, and the request for consent to search — individually constituted a seizure. Considered in combination, they were simply acts that occurred sequentially. They did not combine to form a whole greater than the sum of their parts. Indeed, other facts affirmatively detract from any conclusion that defendant was stopped. Defendant’s initial status while Desmond talked to Williamson was essentially that of a bystander — a bystander who was free to come, go, and move about at will, all of which he did. When Desmond asked for defendant’s identification, a reasonable person in the same circumstances would assume that Desmond wanted to verify whether, as defendant said, he was off of probation; when dispatch confirmed that he was, Desmond so advised defendant. Those facts reinforce our conclusion that, under the totality of the circumstances, defendant was not seized by Desmond’s actions.
That conclusion resolves this case. The trial court concluded that, during the search, defendant’s actions in attempting to conceal the baggie in the palm of his hand, and Fessler’s observations of the baggie, gave the officers sufficient cause to grab his wrist and forcefully open it to determine whether he was concealing drugs, as they believed he was. Defendant has never challenged that conclusion. Nor has defendant challenged the voluntariness of the consent that he gave Desmond to examine what was in his pockets. Defendant’s claim that Desmond exploited an illegal stop of defendant to obtain his voluntary and otherwise valid consent falls with our conclusion that Desmond did not seize defendant at any point before defendant gave his consent to search.
*474 The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

 The other two cases are State v. Backstrand, 354 Or 392, 313 P3d 1084 (2013), and State v. Anderson, 354 Or 440, 313 P3d 1113 (2013). We allowed review in all three cases after having held them in abeyance pending our decision in State v. Ashbaugh, 349 Or 297, 244 P3d 360 (2010).

 As in Backstrand and Anderson, the state also urges us to further revise the two-part “seizure” test that we recently modified in State v. Ashbaugh, 349 Or 297, 316, 244 P3d 360 (2010). As we did in both of those cases, we decline the state’s invitation here because this case does not adequately implicate the prong of the test that the state asks us to reconsider. See Backstrand, 354 Or at 399 n 8 (declining to reach argument); Anderson, 354 Or at 448-49 n 5 (same).

 Defendant urges that Desmond seized him by continuing to request “consent to a search greater than defendant appeared willing to allow.” Any such characterization of the exchange more properly should be presented as a claim that defendant’s consent was invalid because Desmond exceeded the scope of the consent that defendant gave. See generally State v. Weaver, 319 Or 212, 219, 874 P2d 1322 (1994) (discussing “scope of the consent” cases as separate category of cases involving validity of consent to search). Defendant has never raised such a challenge, and we reject a characterization of the search that implicitly assumes an illegality that defendant has never asserted.

 The Court of Appeals also cited State v. Painter, 296 Or 422, 676 P2d 309 (1984), and State v. Warner, 284 Or 147, 585 P2d 681 (1978), for the same proposition. As our discussion of those cases in Backstrand establishes, they, too, are not authority for the per se rule that the Court of Appeals applied. Backstrand, 354 Or at 410, 412.