Submitted November 27, 2012, affirmed May 21, petition for review denied October 2, 2014 (356 Or 397)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRIAN TYRONE BEASLEY,
*Defendant-Appellant.*

Multnomah County Circuit Court
100444412; A146742

326 P3d 634

Peter Gartlan, Chief Defender, and Erik Blumenthal, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Duncan, Judge.

ORTEGA, P. J.

Duncan, J., dissenting.

## ORTEGA, P. J.

Defendant appeals a judgment of conviction for two counts of failure to register as a sex offender, ORS 181.599, and assigns error to the trial court's denial of his motion to suppress. Specifically, defendant argues that the officer unlawfully seized him when, without reasonable suspicion, the officer obtained defendant's identification, asked him about his criminal status, and asked to conduct a records check. The state responds that, under the totality of the circumstances, the officer did not stop or otherwise seize defendant. We agree with the state and, accordingly, affirm.

We begin with the facts, which we state in accordance with the trial court's findings. *State v. Ehly*, 317 Or 66, 74-76, 854 P2d 421 (1993). One morning, at about 5:00 a.m., a Portland police officer saw defendant slumped over the steering wheel of his parked car. The car's motor and lights were off. The officer, concerned that defendant was experiencing a medical issue or was intoxicated, parked across the street and turned on his white spotlight to illuminate the car without activating his emergency lights.[1] The officer then approached the passenger side of defendant's car, tapped on the window several times with his flashlight, and woke defendant. The officer moved around to the driver's side of the car to ask defendant questions and could smell alcohol. In response to questions from the officer, defendant stated that he had been drinking at his friend's house and had decided to sleep in his car because he did not want to drive while intoxicated. The officer was concerned that defendant might commit or had already committed the crime of driving under the influence of intoxicants (DUII); he also believed that he might need to send defendant to a detoxification center. The officer then asked, in a casual tone, for defendant's identification. Defendant handed the officer his driver's license. Then, while holding the driver's license, the officer asked defendant whether he had any warrants or was on probation and whether the officer could check defendant's record. Defendant responded, "Go ahead, check

---

[1] In his brief, defendant claims that the officer's police car was blocking his car. However, the trial court found that the officer parked his car "somewhere across the street," and there is evidence in the record to support that finding.

my record. I'm not worried about it." While the officer was running the records check, a second police officer arrived, parking behind defendant's car. Upon running the check, the officer discovered that defendant was a sex offender and had failed to register as required by statute. When the officer confronted defendant with that information, defendant made incriminating statements. The officer then arrested defendant for failure to register as a sex offender.

Defendant filed a pretrial motion to suppress all evidence, asserting that he had been unlawfully seized when the officer asked for his identification and about his criminal status, and asked to run a records check. Accordingly, he argued that his consent to the records check was the product of that unlawful seizure. The state responded by contending that the stop was lawful because the officer had reasonable suspicion that defendant had committed, or was going to commit, the crime of DUII. The state argued further that, even if the officer did not have reasonable suspicion, the stop was lawful because defendant consented to providing the officer with his license and to the records check.

Although the court rejected the state's argument that the officer had reasonable suspicion that the crime of DUII had been or was going to be committed, it agreed that the officer's request for identification was "mere conversation" and denied defendant's motion. Following a bench trial, defendant was convicted of failure to register as a sex offender, ORS 181.599.

On appeal, defendant assigns error to the trial court's denial of his suppression motion, arguing that he was unlawfully seized by the officer before he consented to the records check because the officer lacked reasonable suspicion that defendant was involved in any criminal activity. Based on the officer's testimony at the suppression hearing regarding his subjective intent, defendant also asserts that he was seized under *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (stating that a seizure occurs "if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement"). The state responds that the interaction between the officer

and defendant was "mere conversation" and did not amount to an unlawful seizure.

Article I, section 9, of the Oregon Constitution protects individuals from unreasonable searches and seizures. "There are three kinds of encounters between police and citizens: arrests, stops and mere conversation." *State v. Calhoun,* 101 Or App 622, 624, 792 P2d 1223 (1990). "Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not." *State v. Fair,* 353 Or 588, 593-94, 302 P3d 417 (2013). In *State v. Backstrand,* 354 Or 392, 399, 313 P3d 1084 (2013), the Oregon Supreme Court recently explained the distinction this way:

> "What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty. The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement. Because of the diversity of potential police-citizen encounters, the inquiry necessarily is fact-specific and requires an examination of the totality of the circumstances involved."

(Citations and footnotes omitted.) For a "show of authority" to give rise to a seizure, the circumstances must be such that a reasonable person would believe "that an officer is exercising his or her official authority to restrain." *Id.* at 401. "Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Id.* at 401-02 (an officer's request for identification from the defendant, whom he thought was underage in an adult store, was not sufficient to seize the defendant); *see also State v. Anderson,* 354 Or 440, 453, 313 P3d 1113 (2013) (an officer's questions and request for identification from the defendant, after seeing him walk up to an apartment, which was being searched for illegal drug activity, and quickly return to his car, was not a seizure even though the officer's questions "objectively conveyed possible suspicion that the driver and [the] defendant

could be involved in criminal activity related to the apartment"). An officer's subjective intentions do not determine whether a stop occurred. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990) ("Article I, section 9, prohibits certain governmental action, not certain governmental states of mind.").

"Verbal police inquires are not, by themselves, seizures." *State v. Highley*, 354 Or 459, 468, 313 P3d 1068 (2013). Specifically, "[a] mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure." *Backstrand*, 354 Or at 410. "Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure." *Id.* at 417. A person who decides to cooperate with an officer's request for identification can reasonably expect that the officer will do something with that identification, such as verify the person's identity or status. *Id.* at 413. In other words, "[t]he fact that the officer conducts that examination [of the identification] is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a *coercive* restraint on the person's liberty." *Id.* at 413 (emphasis in original). In addition, an officer has not seized someone merely by retaining his or her identification for a reasonable period to examine it; "rather, at a minimum, some exercise of coercive authority by the officer, such as retention of the identification after examination and a continuation of investigatory activities, is required." *Id.* at 416 (explaining that *State v. Painter*, 296 Or 422, 676 P2d 309 (1984), "does not stand for the proposition that an officer seizes a person by simply accepting and looking at a person's identification after a noncoercive request"). Instead,

"[f]or a request and verification of identification to amount to a seizure, something more is required * * *. Either through the context, the content or manner of questioning, or the other circumstances of the encounter, the officer must convey to a reasonable person that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement."

*Id.* at 417; *see also Highley*, 354 Or at 472 (clarifying that *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), "should not be understood * * * to stand for the proposition that an officer's

request for identification and a check of that identification, either to determine its validity or the status of the person who tenders it, is a *per se* stop"). This court has also held that an officer's act of shining a police car's spotlight into a car, in and of itself, does not constitute a "show of authority" or restraint of a defendant's liberty. *State v. Aronson*, 247 Or App 422, 428, 271 P3d 121 (2011), *rev den*, 352 Or 33 (2012).

Here, defendant argues that an unlawful seizure occurred when the officer asked for his identification and, while retaining it, inquired about whether he was on probation or had any warrants and if he could run a records check. In defendant's view, a reasonable person in his position would believe that the officer had made a show of authority that restricted his liberty and that he was an "investigatory subject" of a pending investigation and, therefore, not free to leave. Defendant also argues that he was seized while the officer retained his identification because he was unable to leave. Defendant's view does not square with the case law.

In *Highley*, the Supreme Court held that the defendant was not unlawfully seized when a police officer approached him in a parking lot, inquired as to whether he was "still on probation," asked for his identification, wrote down the information and returned the identification, and then radioed dispatch to confirm the defendant's probation status. 354 Or at 462.[2] The court concluded that, under those circumstances,

---

[2] The dissent attempts to distinguish *Highley* from this case on the basis that, in *Highley*, the officer was "not conducting a traffic stop or a criminal stop." 263 Or App at 44 (Duncan, J., dissenting). That is not correct—and, indeed, the circumstances in *Highley* roughly parallel those in this case. In *Highley*, the defendant was a passenger in a car that was pulled over by an officer who knew that the driver of the car was driving with a suspended license. 354 Or at 461. Initially, the defendant walked away to visit an apartment that the officer knew had a "history of drug activity." *Id.* at 462.

During this time, the officer contacted the probation department to check whether the driver's

"probation officer had any 'interest' in the fact that [the driver] was in the area of apartments known to have drug activity and was in the company of people known to be involved with drugs and who had gone to an apartment with a 'history of drug activity,' all of which likely violated the conditions of [the driver's] probation."

*Id.* When the defendant returned to the car, and, while the officer was waiting to find out about the driver's probation status, the officer asked the defendant, whom he knew from "past contacts and arrests involving drug activities," if he was still on probation. *Id.* After the defendant replied that he was not, the officer

the defendant had not been unlawfully seized. *Id.* at 471. The court reasoned that the straightforward request for identification did not amount to a seizure and that a reasonable person could expect that the officer would use the identification to verify the person's status. *Id.* at 469-70. Overall, the court found that the officer's actions did not convey a restraint on the defendant's liberty. *Id.* at 470.

Similarly, here, the facts are insufficient to support an objectively reasonable belief that defendant's liberty was restricted by the officer's contact in a constitutionally significant manner. The officer saw defendant slumped over the wheel of his car and was legally entitled to approach the car to check on defendant's well-being. The officer parked his patrol car across the street from defendant's car without blocking it, and did not turn on his emergency lights; rather, he turned on his car's spotlight to illuminate defendant's car, which did not, by itself, constitute a show of authority. *See Aronson*, 247 Or App at 428. After waking defendant, the officer, in a casual tone, engaged in conversation with defendant, which the trial court characterized as "appropriate." The officer asked defendant for his identification and, as the Supreme Court held in *Backstrand*, that straightforward request did not change the encounter from "mere conversation" into a seizure because the request was not accompanied by a "show of authority." *See Backstrand*, 354 Or at 409. Also, similar to *Highley*, the officer then asked defendant whether he was on probation or had any warrants and if he could run a records check. *See Highley*, 354 Or at 462. The officer briefly retained defendant's identification, but not beyond a period sufficient to verify defendant's status. In addition, while the officer held onto the identification, he simultaneously asked whether he could perform a records check, and defendant responded, "Go ahead, check my record." During that time a reasonable person in defendant's situation would assume that the officer was retaining

---

then asked the defendant for his identification to "confirm that [the] defendant was not on probation." *Id.*

Like the defendant in *Highley*, defendant here was not initially the subject of a traffic stop or a criminal stop. Rather, here, the officer initially approached defendant to check on his well-being before asking for his identification and inquiring about his probationary status.

the identification to verify whether he was, in fact, on probation or had any warrants, not that he was the subject of any other investigation.

The dissent's conclusion that the manner and context of the officer's request for defendant's license conveyed to defendant that he was the subject of a traffic stop cannot be squared with the Supreme Court's case law. Although the dissent acknowledges that an officer's subjective intent to detain a defendant, in and of itself, does not constitute a stop, the dissent's subsequent analysis rests on the officer's subjective intent—specifically, his intent to investigate a possible DUII. 263 Or App at 43-44 (Duncan, J., dissenting). Other than the officer's testimony that his subjective intent was to investigate defendant, the trial court made no findings that the officer's tone—which was found to be "appropriate"—or the circumstances of the encounter—the patrol car's flashing lights were not on nor was it blocking defendant's car—constituted a "show of authority" resulting in an unconstitutional seizure.

Moreover, the dissent's assertion that defendant was seized under the two-part test in *Ashbaugh*, 349 Or at 316, also is incorrect. Under *Ashbaugh*, a stop occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *Ashbaugh*, 349 Or at 316 (emphasis omitted). Contrary to the dissent's contention, the officer's conduct in this case did no more to communicate to the defendant that he was "the subject of a traffic stop," 263 Or App at 42 (Duncan, J., dissenting) than the conduct at issue in *Backstrand* or *Highley*. As the Supreme Court emphasized in *Backstrand*,

"'verbal inquiries [by officers] are not * * * seizures.' Rather, something more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct. The 'something more' can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or

coercive' show of authority requiring compliance with the officer's request."

354 Or at 403 (internal citations omitted). The dissent points to no such circumstances in this case, relying instead on the officer's subjective intent.

Based on the totality of the circumstances, we conclude that a reasonable person would not have felt that the officer was exercising his authority to significantly restrain defendant's liberty or freedom of movement as explained in the case law. Therefore, we conclude that defendant was not seized by the officer's request to see his identification, his inquiry about defendant's criminal status, his brief retention of defendant's identification, or his request to run a records check. Because defendant was not unlawfully seized, the evidence attained through the records check was properly admitted, and the trial court did not err in denying defendant's motion to suppress.

Affirmed.

**DUNCAN, J.,** dissenting.

The issue in this case is whether the officer stopped defendant in violation of Article I, section 9, of the Oregon Constitution.[1] I conclude that the officer stopped defendant for two alternative reasons: (1) because the officer initiated a traffic stop by asking for defendant's driver's license and, as a result, defendant was not free to go; and (2) because a reasonable person in defendant's situation would have believed that the officer had initiated a traffic stop and that, as a result, he or she was not free to go. Therefore, I respectfully dissent.

As the majority recounts, the officer saw defendant slumped over the steering wheel of his car. The car was legally parked on a public street, and its engine and lights were off. The officer, who was in uniform and driving a marked patrol car, parked across the street from defendant's

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

car. He turned the patrol car's spotlight on defendant and then walked to the passenger side of defendant's car to determine whether defendant needed medical assistance or was intoxicated.

The officer knocked on the passenger's window several times with his flashlight to rouse defendant. When defendant awoke, the officer walked to the driver's side of the car and spoke to defendant through the driver's window. The officer could smell an odor of alcohol, and he asked defendant whether he was okay and what he was doing. According to the officer, defendant replied that he had been drinking at a friend's house nearby and, because he did not want to drive drunk, he was sleeping in his car until he was able to drive.

Although, by that point, the officer had determined that defendant was not in need of medical assistance, the officer did not leave defendant. Instead, as part of an investigation, which included a driving under the influence of intoxicants (DUII) investigation, the officer asked defendant for his driver's license, and defendant provided it. As the officer later testified, "I felt that I needed to continue into looking at—if this was DUI[I], did he need a detox, stuff like that, so I did ask for his I.D. based on that." The officer was, by his own description, conducting a traffic stop. His plan was to run a records check to see if defendant had any prior DUIIs or warrants, wait for a cover officer, and then ask defendant if he would submit to field sobriety tests. The officer intended either to arrest defendant or to take him to a detoxification center.

After receiving defendant's driver's license, the officer remained at defendant's door and questioned him further. The officer asked defendant whether he was on probation and whether he had any warrants for his arrest. The officer also asked if he could check defendant's record, and defendant replied that he could. The officer would have run a records check whether or not defendant had consented to one.

The officer returned to his patrol car with defendant's license and ran a records check, which indicated that

defendant was a sex offender and had failed to register as required. The officer questioned defendant about the results of the check, and defendant made incriminating statements. The officer then arrested defendant for failure to register as a sex offender.

The state charged defendant with two counts of failure to register as a sex offender. *Former* ORS 181.599 (2011), *renumbered as* ORS 181.812 (2013). Defendant filed a motion to suppress, arguing that the officer had stopped him in violation of Article I, section 9, and that all evidence derived from the stop—including evidence of his identity and statements—had to be suppressed.

The trial court concluded that, after defendant explained what he was doing in the car, "any reason for any further stop then dissipated[.]" The officer did not have a basis for taking defendant into protective custody, nor did he have reasonable suspicion of DUII.[2] Nevertheless, the court concluded, the officer could continue to engage defendant in conversation and request his identification. Therefore, the court ruled, the officer's request did not constitute a stop.

As explained below, I conclude that the trial court's ruling was in error. Given the context in which the officer's request for identification was made, it constituted a seizure. The request was the initiation of a DUII investigation, which is a significant restriction of a person's liberty. As the officer testified and the trial court found, defendant was not free to leave; he was not free to refuse to cooperate and walk away.

Article I, section 9, protects individuals against unreasonable government searches and seizures. The issue here is whether the officer unreasonably seized defendant.

---

[2] Regarding protective custody, the trial court found that there was "no indication, other than the odor of alcohol, that he's so intoxicated he needed emergency help, that he was a danger to himself or others, so there's simply the fact that he was sleeping in the car." Regarding DUII, the court distinguished the facts of the case from those in which drivers were in cars that were running and noted that, although the officer smelled an odor of alcohol, there was no "further evidence of intoxication, level of intoxication, or any further indication that * * * the crime of Driving Under the Influence of Intoxication had occurred." Thus, the officer's request for defendant's driver's license occurred at a point where the officer did not have authority to detain defendant.

As the Oregon Supreme Court has held, there are three types of encounters between police officers and individuals:

"(1) 'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9;

"(2) 'stops,' a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and

"(3) 'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime."

*State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010) (formatting modified). "The thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309 (citing *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), and *State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978)); *see also State v. Evans*, 16 Or App 189, 196-97, 517 P2d 1225 (1974) ("Restraint of liberty can arise either by means of physical force or show of authority * * * and the constraint of volition is equally real whether it arises by implication from the color of authority of the police or from their express command.").

According to the Supreme Court, a person is "seized" under Article I, section 9, in either one of two situations:

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or

"(b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

*Ashbaugh,* 349 Or at 316 (emphasis omitted; formatting modified). Thus, an officer stops a person when the officer explicitly or implicitly conveys to the person, "either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Backstrand,* 354 Or 392, 401-02, 313 P3d 1084 (2013).

Whether an officer's conduct amounts to a stop is a fact-specific question, resolution of which requires an examination of the totality of the circumstances. *Id.* at 399. If, considered in light of the totality of the circumstances, the officer's conduct gives rise to "a reasonable perception that [the officer] is exercising his or her official authority to restrain[,]" then the officer's conduct constitutes a stop. *Id.* at 401.

Questions and requests by an officer can have the effect of stopping a person. *Rodgers/Kirkeby,* 347 Or at 627-28. Factors relevant to whether an officer's question constitutes a stop include the content of the question, the manner in which it is asked, and the officer's accompanying physical acts. *Backstrand,* 354 Or at 403. They also include the context of the question, such as the officer's prior inquiries and observations of the defendant.

A mere request for identification "does not, in and of itself, result in a seizure." *Id.* at 410. But, such a request may result in a seizure if "the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen[.]" *Id.* at 412; *State v. Rodriguez-Perez,* 262 Or App 206, 211, 325 P3d 39 (2014) (quoting *Backstrand,* 354 Or at 412); *see State v. Painter,* 296 Or 422, 425, 676 P2d 309 (1984) (officer's request for, and retention of, the defendant's identification constituted a stop).

For example, in *State v. Brown,* 31 Or App 501, 506, 570 P2d 1001 (1977), we held that, in light of the totality of the circumstances, an officer stopped the defendant by asking her for identification. In that case, two officers saw the defendant in a high-vice area and told her to leave. When

they returned to the area 45 minutes later, they saw the defendant cross the street and speak with a known prostitute. The officers stopped their patrol car next to the defendant, and one of the officers got out, approached the defendant, and asked her for identification. We concluded that, in light of the officer's interactions with, and observations of, the defendant, a reasonable person in the defendant's position would believe that her liberty was intentionally and significantly restrained. We explained that, although there was "no physical restraint by the police other than asking the defendant to stop and identify herself, * * * in the context of the events as they unfolded it [was] unlikely the defendant would [have felt] free to walk away." *Id.* We noted that the officers who approached the defendant were the same officers who had asked her to leave 45 minutes earlier, and that one of them testified that he "had seen the defendant cross the street in the middle of the block and she would have been arrested for jaywalking if she had refused to produce identification." *Id.* Therefore, we concluded, "[t]his was clearly a stop." *Id.* Thus, *Brown* illustrates that, when the totality of the circumstances are such that a person would have an objectively reasonable belief that he or she is the subject of a traffic or criminal investigation, a request for the person's identification in connection with that investigation constitutes a stop.

If verbal inquiries communicate to a person that he or she is the subject of a traffic stop, the inquiries result in a seizure because "a person detained for a traffic offense has a legal obligation to stop at the officer's direction and remain; the person may not unilaterally end the encounter and leave whenever he or she chooses." *Backstrand*, 354 Or at 406-07 (describing *Rodgers/Kirkeby*). That is because a person who is the subject of a traffic stop is required by law to comply with an officer's orders and to interact with the officer. *Rodgers/Kirkeby*, 347 Or at 623 (citing, *inter alia*, ORS 811.535 (failing to obey a police officer) and ORS 807.620 (giving false information to a police officer)).

In this case, the officer stopped defendant under both parts of the *Ashbaugh* test when he requested defendant's driver's license. As set out above, a stop occurs under

part (a) "if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement," and a stop occurs under part (b) "if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *Ashbaugh*, 349 Or at 316 (emphasis omitted).

Here, defendant was stopped under part (a) because the officer *intended* to significantly restrict defendant's liberty and, *through his actions*, actually did so. The officer intended to initiate a DUII investigation and, by asking for defendant's driver's license, he did. The manner and context of the officer's request for defendant's license conveyed to defendant that he was, as the officer testified, the subject of a traffic stop. As such, defendant was "not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Backstrand*, 354 Or at 401-02; *Rodgers/Kirkeby*, 347 Or at 623.

To be clear, it is not the officer's subjective intent to detain defendant, in and of itself, that constitutes the stop. Rather, it is the manifestation of that intent through the officer's actions and words—understood in the context of the officer's entire encounter with defendant—that constitutes the stop. *Brown*, 31 Or App at 506. As described above, the officer saw defendant slumped over the steering wheel of his car, and he knocked repeatedly on the car's window to rouse defendant. The officer smelled an odor of alcohol, and defendant told the officer that he had been drinking. By that point, the officer recognized that defendant did not need medical assistance, but the officer did not leave defendant. Instead, he remained at defendant's door and, as part of a DUII investigation, asked defendant for his driver's license. Under the circumstances, the officer's request for defendant's driver's license was a show of authority; in context, the request conveyed to defendant that defendant was "not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Backstrand*, 354 Or at 401-02. Defendant was in the driver's seat of his car, he had admitted that he had been drinking, and, after defendant had explained what he was doing, the officer stayed at defendant's door and asked

for defendant's driver's license. By initiating that investigation, the officer seized defendant; the officer put defendant in a position where defendant was required by law to comply with the officer's order and interact with the officer. As the trial court concluded, defendant was not free to leave. He was seized under part (a) of the *Ashbaugh* test.[3]

Defendant was also seized under part (b) of the *Ashbaugh* test because, when the officer asked defendant for his driver's license, defendant would have reasonably believed that the officer was conducting a traffic or criminal investigation, which, in fact, he was. In other words, the significance of the officer's request would not have been lost on defendant. A reasonable person in defendant's position would have believed that the officer was conducting an investigation requiring his or her cooperation. Thus, defendant was seized under part (b) of the *Ashbaugh* test.

The majority analogizes this case to *State v. Highley*, 354 Or 459, 461, 313 P3d 1068 (2013), in which the Supreme Court held that a defendant was not seized when the officer approached him in a parking lot and asked for his identification and whether he was still on probation. The difference between *Highley* and this case is that the officer in *Highley* was not conducting a traffic stop or a criminal stop; he was not investigating a DUII or any other crime.[4]

---

[3] The majority contends that my analysis rests on the officer's subjective intent. 263 Or App at 34-35 n 2. The officer's subjective intent plays a role in determining whether a person is stopped under part (a) of the *Ashbaugh* test, but I do not rely exclusively on the officer's subjective intent. As explained above, in context, the officer's act of asking defendant for his driver's license constitutes a show of authority, that is, an act that would convey to a reasonable person that the officer was exercising his official authority to detain, specifically, to detain for a traffic or criminal investigation.

[4] The majority asserts that this case is not distinguishable from *Highley*. According to the majority, the officer in *Highley* was conducting a traffic or criminal stop. That is incorrect. In *Highley*, the officer did not ask for the defendant's identification in order to initiate a traffic or criminal investigation. To the contrary, the officer asked defendant for his identification because he "wanted to confirm that defendant was not on probation." 354 Or at 462. Nothing in the context of the officer's request indicated that the officer suspected the defendant of a traffic violation or a crime (whereas here, the context indicated that the officer suspected defendant of DUII). As the Supreme Court explained:

"Defendant's initial status while [the officer] talked to [one of defendant's companions] was essentially that of a bystander—a bystander who was free to come, go, and move about at will, all of which he did. When [the officer] asked for defendant's identification, a reasonable person in the same circumstances

Here, because the officer's request for defendant's driver's license constituted a stop, it had to "be justified by, for example, necessities of a safety emergency or by reasonable suspicion that [defendant was] involved in criminal activity[.]" *Ashbaugh*, 349 Or at 309. It was not; therefore, it violated Article I, section 9, and any evidence derived from it had to be suppressed, *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005), including defendant's identity, the results of the records check, and defendant's statements. *See State v. Ayles*, 348 Or 622, 638-39, 237 P3d 805 (2010) (statements); *State v. Starr*, 91 Or App 267, 270, 754 P2d 618 (1988) (identity). That evidence was the direct product of the officer's request for defendant's driver's license. The request resulted in the production of defendant's license, which was used to identify defendant and run the records check, the results of which were used to obtain defendant's statements.

In sum, because I conclude that the officer stopped defendant in violation of Article I, section 9, and, therefore, the trial court erred in denying defendant's motion to dismiss, I respectfully dissent.

---

would assume that [the officer] wanted to verify whether, as defendant said, he was off of probation; when dispatch confirmed that he was, [the officer] so advised defendant. Those facts reinforce our conclusion that, under the totality of the circumstances, defendant was not seized by [the officer's] actions." 354 Or at 473.