Submitted on remand from the Oregon Supreme Court July 10, affirmed September 17, 2014, petition for review denied January 15, 2015 (356 Or 685)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KEVIN ANTHONY WRIGHT,
*Defendant-Appellant.*

### Marion County Circuit Court
07C51533; A138252

335 P3d 870

Peter Gartlan, Chief Defender, and Irene B. Taylor, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the answering brief for respondent. On the supplemental brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General. Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the supplemental brief.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Schuman, Senior Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

This case is before us for the third time, on remand from the Oregon Supreme Court. In our initial opinion, issued *per curiam*, we reversed and remanded defendant's conviction for failure to register as a sex offender on the ground that the trial court should have granted defendant's motion to suppress, based on our decision in *State v. Anderson*, 231 Or App 198, 217 P3d 1133 (2009), *adh'd to on recons*, 234 Or App 420, 228 P3d 638 (2010), *rev'd*, 354 Or 440, 313 P3d 1113 (2013). *State v. Wright*, 233 Or App 471, 255 P3d 149 (2010). The Supreme Court vacated our initial decision and remanded the case to us for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010). *State v. Wright*, 349 Or 663, 249 P3d 1281 (2011). On remand, we again concluded that defendant's motion to suppress should have been granted. *State v. Wright*, 244 Or App 586, 260 P3d 755 (2011). The Supreme Court has again remanded the case to us, *State v. Wright*, 355 Or 567, 329 P3d 770 (2014), to reconsider it in light of *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013), and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013). For the reasons set forth below, we now affirm defendant's conviction.

We set forth the facts as recited in our previous opinion:

"One night in October 2007, police officers arrested defendant's friend in an apartment. The friend asked an officer to let defendant know he had been arrested. Defendant and his sister were sleeping in a car in the apartment complex parking lot. The officer approached defendant's car and, as reported, found defendant and his sister sleeping in the car. The officer asked who they were and asked for identification. Defendant gave the officer his Oregon ID card.

"When the officer radioed defendant's name in to dispatch, he learned that defendant was a registered sex offender. The officer returned to the car and asked defendant why he was sleeping in the car; defendant responded that he was transient. The officer asked defendant if he was living in his car instead of the address where he was registered as a sex offender, and defendant replied that he was

living in his car and had not registered a new address. The officer asked defendant if he knew he had to register even if he did not have a specific address, and defendant admitted that he did. The officer arrested defendant for failure to register as a sex offender."

*Wright*, 244 Or App at 588. Defendant moved to suppress, arguing that he had been unlawfully stopped when the officer took his identification. Our initial reversal was based on our decision, *State v. Anderson*, 231 Or App 198, 203, 217 P3d 1133 (2009), in which we had held that a defendant had been stopped when officers requested his identification, and in which we had applied a "subjective" test to determine that the defendant had been stopped. In our second opinion, we acknowledged that the "subjective" approach to the issue had been disavowed in *Ashbaugh*, but nonetheless concluded that under an objective standard, defendant had been stopped when the officer "asked for identification, and immediately radioed dispatch to determine whether defendant was the subject of any warrants." *Wright*, 244 Or App at 590-92. As noted, the Oregon Supreme Court has remanded again to us for reconsideration.

On remand, the parties dispute how *Backstrand*, *Highley*, and *Anderson* apply in these circumstances. We begin our discussion with a brief summary of the pertinent law, as set forth in *Backstrand*:

> "What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some show of authority, of some restraint on the individual's liberty.' *Ashbaugh*, 349 Or at 309. The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement. *Id.* at 316. Because of the diversity of potential police-citizen encounters, the inquiry necessarily is fact-specific and requires an examination of the totality of the circumstances involved. [*State v. Holmes*, 311 Or 400, 408, 813 P2d 28 (1991)]. As we recently acknowledged in [*State v.*] *Fair*, 'in practice, the line between a mere encounter and something that rises to the level of a seizure does not lend itself to easy demarcation.' 353 Or [588, 595, 302 P3d 417

(2013)]. Rather, as this court recognized in *Holmes*, the standard is necessarily vague 'when unadorned by judicial interpretation based upon specific fact situations' and does not provide 'a ready answer for every conceivable' police-citizen encounter that can arise. 311 Or at 410. As a result, 'In many cases it is clear that a person has been seized. But there are many instances in which it is less obvious whether a police-citizen encounter is a seizure.' *Id.* at 407.

"Although close cases can—and frequently do—arise, beginning with *Holmes*, this court has remained steadfast in recognizing that the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens. In an oft-cited and oft-quoted passage, *Holmes* stressed that 'law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.' 311 Or at 410[.] * * * [A] seizure exists only if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens. *Id.* at 409-10."

354 Or at 399-400 (footnotes and some internal quotation marks omitted).

The primary issue in *Backstrand*, which also was presented in *Highley* and *Anderson*, concerned "whether an officer effectively seizes an individual simply by asking for an individual's identification." *Id.* at 409. The court concluded that such an action did not, in itself, constitute a stop. *Id.* at 410. It went on to note, however, that a request for identification, when accompanied by other police conduct, could constitute a stop, citing as examples a case in which police took and retained a suspect's identification and credit cards, and another case in which an officer asked for identification and indicated that the suspect would not be free to leave until after the officer cleared up his investigation. *Id.* at 410-11. In *Backstrand*, though—and in *Highley* and *Anderson* as well—the court concluded that no stop had

occurred in conjunction with the taking of the defendants' identifications.

We briefly describe the circumstances of those cases. In *Backstrand*, after an officer had performed an age check on a patron at an adult establishment, he returned the patron's identification and wished him a nice day. *Id.* at 395. In performing the age check, the officer had determined that the patron's driver license was suspended. *Id.* Later, the officer saw the patron driving, which ultimately led to the prosecution in that case. *Id.* The court concluded that, under the circumstances, the patron had not been stopped when the officer briefly checked his identification. *Id.* at 417-18. In *Anderson*, the defendant and a companion had approached an apartment where officers were executing a search warrant, then quickly returned to their car when they observed the police. 354 Or at 442-43. Multiple officers approached the car, wearing raid vests, asking for identification and asking why defendant and his companion had come to the apartment. *Id.* at 443. The court acknowledged that the officers "conveyed possible suspicion that the driver and [the] defendant could be involved in criminal activity," but also noted that there was no suggestion that the officers' tone or manner were overbearing or controlling and the verbal exchanges were brief, and concluded that "by those brief verbal exchanges and inquiries alone, the officers did not communicate an exercise of authority of the kind required for a seizure." *Id.* at 453. Similarly, in *Highley*, the defendant, who was a passenger in a car whose driver was under investigation, was asked for identification because an officer wanted to determine whether he was on probation. 354 Or at 462. After determining that the defendant was not on probation, the officer informed the defendant that he had confirmed that the defendant was not on probation, then sought permission to search, which ultimately led to discovery of evidence of a crime. *Id.* at 464. The court, noting in particular that the identification had been retained only briefly and that the defendant had moved around freely during the encounter, concluded that the defendant had not been stopped. *Id.* at 470-71.

We turn to the present case, in light of the analysis and description of events in *Backstrand, Anderson,* and

*Highley*. Defendant acknowledges that, under those cases, asking for, taking, and checking a person's identification is not a sufficient show of authority to constitute a stop. He urges, however, that the facts of this case call for a different conclusion. In particular, he notes that, in *Anderson*, the court did conclude that the defendant later was stopped (after the officers had developed reasonable suspicion of a crime and conveyed that suspicion to the defendant) when the officers asked him to step out of the car. 354 Or at 454. Here, defendant asserts, he presented evidence at the suppression hearing that the officer asked defendant to open the car door in the course of asking for defendant's identification. Although the trial court did not make a factual finding on that point, and the officer's testimony that he was at the driver's window when he asked for identification may be in conflict with defendant's testimony on that point, we assume for purposes of this analysis that the trial court credited defendant's statement that the officer asked defendant to open the door of the car to hand over the identification. We disagree with defendant, however, that an officer making such a request in these circumstances is engaging in a show of authority that transforms an encounter into one in which a person would "reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way." *Backstrand*, 354 Or at 400 (citing *Holmes*, 311 Or at 409-10).

Defendant contends that this case is similar to *State v. Zamora-Martinez*, 264 Or App 50, 331 P3d 1023 (2014), in which we concluded, in light of *Backstrand*, *Anderson*, and *Highley*, that a defendant had, in fact, been unlawfully stopped. In that case, officers executing a search warrant at the defendant's sister's residence had contacted the defendant's sister to have someone come and get the minor children who were at the residence, and the sister had sent the defendant to take charge of the children. *Id.* at 52-53. When the defendant arrived, the officer in charge, an Immigration and Customs Enforcement official, asked the defendant for his identification. *Id.* at 53. The defendant produced a valid Oregon identification card. *Id.* Rather than turning the children over to the defendant, the officer instead asked the defendant what his country of origin was and then asked

him to produce additional identification. *Id.* In that circumstance, we concluded, the officer's request for *additional* identification, after having been provided identification sufficient to establish the defendant's identity as the person authorized to take custody of the children, was a stop. *Id.* at 56. We concluded that, in that circumstance, a reasonable person would not have been able to go about his business (of picking up the children at the officer's request) without complying with the officer's request for additional identification. *Id.*

The present case is similar to *Zamora-Martinez*, and in fact similar to *Backstrand*, only in the sense that the officer's original approach to defendant and request for identification was not, at least ostensibly, to investigate the person approached regarding a crime. In *Zamora-Martinez*, the officer could quite reasonably check identification of a person picking up children, to ensure that the children were being turned over to the correct person. In *Backstrand*, the court explained at length that verifying the age of a patron in an age-restricted store was not the sort of show of coercive authority that would lead a person to believe that he or she was unable to leave. Rather, in fact, a patron in that position who was unable to produce proper identification "at most * * * might reasonably expect to be told to leave * * *." *Backstrand*, 354 Or at 414-15. In the present case, the trial court specifically found that the officer who approached the car in which defendant was located did so "not as a part of police activity but just as a gesture of good will," when he "went out and talked to the defendant and his sister in the vehicle, to let them know" that their friend had been arrested. In *Backstrand*, the request for identification—and in *Zamora-Martinez*, the initial request for identification—did not constitute a stop. As the court explained in *Backstrand*, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Backstrand*, 354 Or at 401-02. What transformed the encounter in *Zamora-Martinez* into a stop was that the second request for identification—after valid identification had already been produced—conveyed

to the defendant in that case that he was not, in fact, free to go about his "ordinary affairs," which, under those circumstances, involved having the officers release his sister's children to him.

In the present case, by contrast, there was no similar showing of coercive authority. The officer approached defendant and his sister in order to give them information, then asked for and very briefly retained their identifications without giving them any indication that their movements were being significantly restricted. That the officer might have had defendant open the car door to hand out his identification rather than handing it through a window is, in these circumstances, not a significant enough act to transform the encounter at issue here into a stop. *Cf. State v. Dierks*, 264 Or App 443, 451-52, 332 P3d 348 (2014) (officer approaching the defendant who was seated in the car, asking her what she was doing, then running an identification check was not a stop).

The trial court correctly denied defendant's motion to suppress.

Affirmed.